*Phelps & David,* for plaintiffs in error.

*Jmes O. Troup* and *Beverstock & Donehay,* for defendant in error.

---

## CONTRIBUTORY NEGLIGENCE IN DISREGARDING ORDERS.

[Circuit Court of Lucas County.]

THE WHEELING & LAKE ERIE RAILROAD COMPANY V. HATTIE I. FISHER, ADMINISTRATRIX.

Decided, March 10, 1904.

*Negligence—Railways—Locomotive Engineer Killed by Accident Which Could Have Been Avoided—By Obeying Orders on His Part—Or by Prevention by the Company of Obstruction Falling Upon the Track.*

A locomotive engineer who had been ordered to "look out for rocks falling in cuts east and west of Rockford," was killed by his engine striking a rock in one of these cuts, while running twenty miles an hour. *Held:* That recovery on the part of the widow is precluded by the contributory negligence of the engineer in not keeping his train under complete control on that part of the road specified in the order.

HAYNES, J. (orally); PARKER, J., and HULL, J., concur.

A petition in error was filed in this court to reverse the judgment of the court of common pleas. The action was brought

by Hattie I. Fisher, administratrix, against the railroad company for the purpose of recovering damages from the railroad company occasioned by the death of her husband, which it is averred was caused by the negligence of the defendant company. Such proceedings were had in that case as that a verdict was rendered by the jury for the plaintiff in the sum of $7,500, and a judgment was entered upon that verdict. And this petition in error is prosecuted for the purpose of reversing that judgment and to set aside that verdict.

The accident occurred at a place called Rock Point, in the southeastern part of the state, and about three or four hours run this side of Wheeling. An outline of the facts is: In that part of the state the country is broken and rolling, and at various places there are cuts through which the railroad passes, the last one in that section being this Rock Point, as it is called. In the immediate neighborhood of this point the last station is a place called Rockford, which was about four miles from the Rock Point, and the road from there runs along to a point about a mile and three-quarters east of Rock Point, where you arrive at a place called the Summit Point, making it up grade the most of the time to that point, and from there it was for some distance down grade, the next station being two or three miles beyond Rock Point. From this summit down to Rock Point there is a drop of 70 feet in the grade.

The decedent had left Wheeling with a freight train on April 4th, 1901, at 5:35 in the evening, or afternoon. He arrived at Rock Point at about 9:35 in the evening. He had stopped at Rockford about a half an hour, waiting for a passenger train to pass to the eastward, and after it had passed this train started for the next station. When he reached the summit and as he came over the summit and the train was partly across the summit, he shut off the steam and from that point the train run by its own weight. When he arrived at this point the train struck a falling rock about six feet long by three feet wide and three feet thick. The locomotive passed over the rock and passed on 150 or 200 feet along the ties, being thrown off the rails, where it turned over and the engineer, H. H. Fisher, was killed. The fireman who was in the cab with him had the

good fortune to escape with scarcely an injury, although he went over in the locomotive with the engineer.

This Rock Point is the point of a hill, and this cut that I speak of is a cut through that point. The point itself, when you come to the center of the point, is said to be from 35 to 50 feet high and 150 to 200 feet wide—that is, the point itself—the cut, however, is from 600 to 900 feet long and is on a curve— the road curves around this point. The point is cut away, not perpendicular perhaps—it is cut off at the base and comes near the railroad track; at the top it extends back. It is formed of gravel and rock, some loose earth and rock and sand and stone under, and during the wet season or during the time the frost is coming out of the ground in the spring, pieces of rock and gravel work loose, become detached and fall upon the track, and this is known to occur from time to time. The railroad company at times had employed a watchman, or rather the foreman of the section gang had been in the habit from time to time to send a man out as a watchman at this point, when he thought there was serious danger of rock falling. This, however, was not a fixed habit, but was done from time to time according to the judgment, evidently, of the section foreman. On this particular night in question there was no watchman sent out.

It is contended in the petition that the railroad company was guilty of negligence contributing to the death of the engineer, in that it had failed to send out a watchman to watch along the track at this time, knowing, or having reason to know that there was danger of rock falling at that point.

Conceding now that the jury would be fully warranted in finding that the railroad company was guilty of negligence in not sending out a watchman at that time, having no watchman there, the controversy in the case has turned upon the fact as to whether or not the engineer himself was not guilty of contributory negligence in causing this disaster; whether he was not, in fact, the real cause, the real active person in the matter of negligence in respect to the accident.

The railroad company—while this foreman did sometimes send a man out there—did not rely upon the fact that a watchman might be sent out, perhaps did not place a great deal of reli-

ance upon it; but whether they did or not, they did from time to time send out telegrams and dispatches to their conductors and engineers in regard to their duty in the matter; and on the morning of this day they had sent from the office of the assistant superintendent at Toledo, an order directed to the engineers and conductors on the road, which had been delivered to the engineer and conductor of this train, a telegram which read as follows:

"Reduce speed to five miles an hour through the cut east of Valley Junction."

Now Valley Junction was thirty-six miles west of this point. The company had been carrying forward some work there either of repair or improvement of the road and the tracks were said to be in a very unsafe condition; and that part of the telegram related to the passage of trains on that side of Valley Junction. It then continues:

"And look out for rocks falling in cuts east and west of Rockford."

Now Rockford is the station I have spoken of about four miles from this point, and there were cuts, as I have said, east of that point and also this cut west of it.

Now this engineer had this order in his pocket. He had his train composed of forty-five cars; they were all loaded, some with steel bars, some with coal, some with merchandise, and perhaps some other things—they were loaded to their full capacity and weighed perhaps, if I remember right, an aggregate of 1,530 tons. The train had in it thirty of those cars, equipped in the most perfect manner with air brakes. And it is said by experts that fifteen air brakes would have been sufficient to handle that train. With thirty of those he had full and complete power to control his train; he had a good engine; it was a well equipped train—it had some fancy name which I have forgotten.

Some question is raised here in regard to the construction of this telegram, this order, what the engineer should understand by it, what should be its meaning, and considerable testimony

has been taken by the parties, of experts, engineers and others, in regard to the meaning of a telegram of this kind, what the engineer should understand it to mean. The testimony on behalf of the railroad company and perhaps some of the testimony on behalf of the plaintiff is that it means that he is to keep a lookout for rocks and keep control of his train, so that he can stop it upon seeing a rock within the line of his vision.

Well, to an ordinary person, there should be no question as to the fair construction of that telegram—he shall look out for falling rock; he must look to see if any have fallen, keep watch in front of him; it is notice to him that these rocks are likely to fall upon the line of his tracks; that he is to look out for them and avoid them. In order to do that he must keep his train under such control that he can stop the train within his range of vision, if necessary.

Now that was a step that had been taken by the company for the protection of its train and engineer. The engineer at all times between stations had control of the engine and the running of the train; it was he who said how fast it should run or how slow it should run. It was his duty to control the running of the train between stations.

As I have said, in passing over the summit a mile and three-quarters away, the train was not going very fast; it was going up grade. It started on down the grade to this point, and as I have said there was in that mile and three-quarters a drop of seventy feet. This was a heavy train. The fireman says that the train had a speed of at least twenty miles an hour, and in that he is supported by the others of the crew, the conductor and brakeman. The fireman says the engineer took his position in the cab on the seat, with a window back of him closed; it was a little cold. As they come over the summit he had the window shut that was at his right hand side. There was a window in front of him, of course; he sat there with his arms folded until after they were at the point of the rock in this cut; they had passed nearly through it—got nearly past this point, perhaps nearly at this main point, Rock Point, when the fireman looking out of his window on his side—being on the left hand side, inside of the curve, passing around the curve, and discovered this

rock lying across the track, at a distance perhaps of 100 feet ahead of him, as he judged. He shouted to the engineer that there was a rock on the track. The engineer then jumped and pulled at the throttle—set his air brake—and about that time they were on the rock. The engine, as I have said, was over-turned, and the cars, some fifteen or sixteen of them, were piled up to a height of a great many feet, one on top of the other; and a great deal of damage was done to the train.

Now the question that is argued here, as I have said, is whether this engineer was guilty of negligence, such negligence as pre-cludes a recovery. It is claimed upon the part of the defendant in error that he had a right to rely upon the fact that there should be a watchman there. It must be noted that while he was running on this line back and forth, that these watchmen are only there from time to time, not a steady fixed practice. And that he, when he come over that point, would not know whether there was in fact a watchman there or not. We do not consider that as very material. This engineer was placed in a position of responsibility; he was placed in charge of the engine upon this train, and placed in control of the train itself and the rate of speed at which it should run, at least between stations. His duty to his company was to obey its orders; and if the com-pany, in the performance of this duty for the operation of its property, said to him by an order that he should look out for falling rocks, it was an order to him to so run his train and take such care that he would not injure, by any act of his, at least, the train that was in his charge. He had but one thing to do and that was to obey that order; and he could only obey it by operating his train at such a rate of speed as that he could stop it within a very short distance. It is said by some it should be down to between five and six miles an hour. He had the power to do this; the power in his hands to stop that train at any point he chose between stations. But from all the evidence it seems that instead of taking such steps he sat down and al-lowed his train to proceed in the ordinary manner at such a rate of speed as it would obtain by its own weight, in going down a grade with this fall in it. And in doing that we think he was guilty of negligence, disobedience of orders; and that it was

due to that disobedience of orders, apparently, that this accident occurred. Upon the facts of this case if he had been running his train as he should have run it, he would have been able to stop the train before it reached the rock; and would have preserved his own life and the property of the railway company. It is a case, if you please, where there was negligence of both parties—negligence may be assumed of the railway company, and negligence of the engineer. He had been cautioned by his conductor before that time that he had been running down that cut too fast, but he did not seem to have noticed that.

We think upon the clear rules of law, where the facts are as we have stated them, the plaintiff here is precluded from recovering for the death of her husband. It is a case where death was caused by his own negligence, and he could not recover if he were only injured and sued the company; so she can not recover.

With this view of the case, the judgment of the court of common pleas is reversed, the verdict set aside and the case remanded for a new trial.

*C. A. Seiders,* for plaintiff in error.

*Kohn & Northup,* for defendant in error.